IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR RATIONAL SEXUAL OFFENSE LAWS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:17CV53 |
| ATTORNEY GENERAL JOSHUA STEIN, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of five amendments to Article 27A of Chapter 14 of the North Carolina General Statutes which pertain solely to registered sex offenders. (*See* ECF No. 33 ¶¶ 8–9.) Before the Court are: (1) a motion to exclude expert testimony, (ECF No. 108); (2) cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, (ECF Nos. 83; 84); and (3) two motions to seal brought by Plaintiffs pursuant to Rule 5.2, (ECF Nos. 96; 100). For the reasons stated below, the Court will grant Defendants' motion to exclude expert testimony, deny each party's motion for summary judgment, and grant Plaintiffs' motions to seal.

## I.    BACKGROUND

Plaintiffs in this action are John Doe,[1] an individual required to register as a sex offender in North Carolina, and two non-profit organizations (collectively, "Organizational Plaintiffs") that advocate for individuals with such restrictions. (ECF No. 33 ¶¶ 23, 29, 31, 44, 46.) Plaintiff John Doe currently resides in North Carolina Judicial District 15A and was convicted for sexual assault in 2002. (*Id.* ¶¶ 22–23.) Plaintiff National Association for Rational Sexual Offense Laws ("NARSOL") and Plaintiff North Carolinians for Rational Sexual Offense Laws ("NCRSOL") are "voluntary membership organization[s]," each having as its purpose "to advocate, both legislatively and legally, for the reform of state and national laws regarding sex offender registries and legal restrictions placed on registrants . . . and to seek to vindicate the constitutional rights of its members." (*Id.* ¶¶ 29–31, 44–46.) Organizational Plaintiffs' members include, among others, "current registrants subject to the provisions of the law." (*Id.* ¶¶ 32, 47.)

Defendant Joshua Stein is North Carolina's Attorney General who is "charged with defending the interests of the State in all criminal and civil suits." (*Id.* ¶¶ 13–14.) Defendants Lorrin Freeman, Pat Nadolski, and Kristy Newton (collectively, "Individual DAs") are current or former North Carolina district attorneys for Judicial Districts 10, 15A, and 16A, respectively. (*Id.* ¶ 18.) Each DA, at the time of the initial Complaint, was "responsible for

---

[1] This Court entered an Order on August 7, 2017 allowing this Plaintiff to proceed under a pseudonym. (ECF No. 22 at 4.)

the prosecution of crimes in their respective judicial districts." (*Id.*) All Defendants have been sued in their official capacities. (*Id.* ¶¶ 13, 18.)

According to Plaintiffs, North Carolina passed its first sex offender registry law in 1995. (*Id.* ¶ 59.) This law is codified in Article 27A of the North Carolina Criminal Code, N.C. Gen. Stat. §§ 14.202.5, 14-202.6, 14-208.5–45. (*Id.* ¶ 8 n.1.) "Th[e] initial registry law did no more than create a database of persons who had been convicted of a relatively small number of qualifying offenses." (*Id.* ¶ 60.) Defendants acknowledge, however, that "the Registry has evolved" in the ensuing years. (ECF No. 88 at 4.) More specifically, amendments in 2006, 2008, 2009, and 2016 have expanded the initial statute to include "verification requirements, employment restrictions, residency restrictions, and premises restrictions." (*Id.* at 5–7.) Plaintiffs allege that the retroactive and collective application of these amendments violates the Ex Post Facto Clause of the United States Constitution. (ECF No. 33 ¶¶ 277–281.) This clause, found in Article I, U.S. Const. art. I, § 10, cl. 1, prohibits legislation that "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts," *Collins v. Youngblood*, 497 U.S. 37, 43 (1990).

## II.  DEFENDANTS' MOTION TO EXCLUDE

First, Defendants move to exclude the expert report of Andrew Doll. (ECF No. 108.) Mr. Doll has, according to Plaintiffs, "worked with hundreds of individuals subject to probation, supervised release, and the strictures of the North Carolina sex offender registry" in his roles with multiple community-based support organizations. (ECF No. 111 at 1–2 (citing ECF No. 111-1 at 1).) Mr. Doll relies on this experience to offer his opinion that "the

3

North Carolina sex offender registry replicates and is more severe than the requirements of probation and supervised release." (ECF No. 111-1 at 8–10.)

Federal Rule of Evidence 702 requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This "gatekeeping" obligation applies to all expert testimony under Rule 702, and not just the scientific testimony at issue in *Daubert*. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999). The judge's evaluation of whether expert testimony is admissible under Rule 702 is "a flexible one," and the judge is given "broad discretion" in the determination of whether an expert's testimony is reliable. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see also Kumho Tire*, 526 U.S. at 152. "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

While expert testimony based on experience does not rely on a process like the scientific method, "this does not lead to a conclusion that 'experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.'" *United States v. Wilson,* 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note). Rather, even though "a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque," a district court must still require a purported expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for his opinion, and

how [his] experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note).

In *Wilson*, for instance, the Fourth Circuit affirmed the admission of expert testimony from a veteran law enforcement officer who had been trained by the U.S. Drug Enforcement Administration when the officer explained how he had used patterns of speech in the conversations of two alleged drug dealers to decode their communications. *Wilson*, 484 F.3d at 275–78. On the other hand, the Fourth Circuit found that the district court should have excluded the officer's testimony when he "interpreted language that needed no interpretation." *Id.* at 276, 278 (finding, for instance, that a "translation" of the straightforward statement "he take too long, I'm going to see my other man, yo" was inadmissible because the meaning of the quoted language was clear even to those without similar expertise). Further, the Fourth Circuit additionally held that the officer's testimony should have been excluded when the officer did not "adequately explain his methodology in reaching a questionable interpretation." *Id.* at 278.

Mr. Doll testifies that he has worked with hundreds of individuals subject to the requirements of probation, post-release supervision, and the North Carolina sex offender registry as a staff member with multiple community support programs. (ECF No. 111-1 at 1–2.) This work includes conducting research on barriers to employment, interviewing sex offenders and their potential employers, teaching classes with local law enforcement on restrictions applying to each category of offender, reviewing hundreds of conditions of release, and having "thousands of conversations regarding specific application of conditions." (ECF No. 111 at 2–3.) Through this experience, Mr. Doll asserts that this has allowed him to

5

become "intimately familiar with the statutes, regulations, practical applications, and practical effects of each of these systems." (ECF No. 111-1 at 1.)

Citing to several provisions of the North Carolina General Statutes, Mr. Doll uses the bulk of his report to provide descriptions of probation, post-release supervision, and the state sex offender registry. (*See id.* at 3–7.) To the extent that Mr. Doll merely provides his interpretation of existing state law, such information—like the officer's translation of a transcript whose meaning is clear—is not helpful to the Court. It merely adds commentary to statutes the Court has the expertise and authority to interpret on its own.

In addition to these summaries, Mr. Doll offers two distinct opinions to the Court. First, he asserts that the premises restrictions found in N.C. Gen. Stat. § 14-208.18 prevent sex offenders "from being at nearly all public spaces and gatherings and . . . from engaging in much of the employment that they would normally be able to find." (*Id.* at 7.) Yet Mr. Doll provides no basis for this broad and vague opinion aside from his general experience. He does not inform the Court whether he gathered this information from conversations with registrants, through class preparation, or through reading individual post-release reports. There is thus no way for the Court to decipher how Mr. Doll applied his experience reliably to reach this finding.

Second, Mr. Doll concludes his report by asserting that "the North Carolina sex offender registry replicates and is more severe than the requirements of probation and supervised release." (*Id.* at 10.) Again, Mr. Doll is not specific in how he reaches this conclusion, though he appears to rely in part upon his summaries of statutory provisions. (*Id.* at 8–9.) As discussed above, such testimony from someone who is not an expert in the law is

6

not helpful to the Court. Mr. Doll also appears to rely on conversations he has had with registrants, stating that "[p]lacement on the registry is routinely considered by my clients the most serious part of the sentence." (*Id.* at 9.) Even if this is the case, such statements are not a solid basis for concluding that the registry either "replicates" probation or supervised release, nor that it is in some ways "more severe."

In ruling on a motion to exclude the testimony of an expert witness, a trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This Court concludes that Plaintiffs have not shown by a preponderance of the evidence that Mr. Doll's report explains how his experience leads to his conclusions nor how those experiences have been reliably applied to the facts. Therefore, the Court grants Defendants' motion to exclude Mr. Doll's testimony, and the Court will not consider his report in its consideration of the summary judgments before it.

## III.  SUMMARY JUDGMENT

The Court next considers the parties' cross motions for summary judgment. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th

Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). That means that a court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must usually adopt "the [nonmovant's] version of the facts" even if it seems unlikely that the moving party would prevail at trial, *see, e.g.*, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

Whether an amendment to a statute is ex post facto as applied to a particular plaintiff is a question of law. *United States v. Farrow*, 364 F.3d 551, 554 (4th Cir. 2004). In making that assessment, both parties agree that *Smith v. Doe*, 538 U.S. 84 (2003), provides the proper test, (*see* ECF Nos. 85 at 25; 88 at 18). The Supreme Court in *Smith*, in considering legislation expanding the scope of Alaska's sex offender registry, outlined a two-part inquiry that first considers whether "the intention of the legislature [in enacting the statute] was to impose punishment." 538 U.S. at 92. If punitive intent is found, "that ends the inquiry." *Id.* On the other hand, if a court finds that the legislature's intention "was to enact a regulatory scheme that is civil and nonpunitive," the court must next determine whether the scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* (citations and quotations omitted). The Court, therefore, first considers the legislative intent of the amendments in question.

## A. Legislative Intent

In determining whether a legislature intended a statute to be punitive or regulatory, a court "must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Hudson v. United States*, 522 U.S. 93, 99 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 248 (1990)); *see also Smith*, 538 U.S. at 92 ("Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997))). Following this inquiry, a court may also consider additional factors, such as "the manner of [the statute's] codification" and "the enforcement procedures it establishe[d]." *Smith*, 538 U.S. at 94. The Court now turns to each of these considerations in turn.

North Carolina's original registry law is codified as part of Article 27A of the North Carolina General Statutes and expressly provides that:

> [I]t is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.

N.C. Gen. Stat. § 14-208.5. As this Court has previously held, "[o]n its face, this purpose does not reflect an intent by the State that its registry laws impose criminal punishment." (ECF No. 47 at 26.) Plaintiffs concede as much, acknowledging that this provision contains no express statement as to whether it was intended to be civil or criminal in nature. (ECF No. 85 at 26–27 (stating that this stated purpose suggests "perhaps that the *original* enactment is a civil regulatory measure" (emphasis in original)).)

9

Yet Plaintiffs argue that the subsequent amendments to the statute—which impose restrictions on residency, occupation, and travel—establish affirmative restraints that are "completely divorced" from simply "assist[ing] law enforcement through information gathering and exchange." (*Id.* at 27.) In spite of this argument, Plaintiffs acknowledge that there are no other express statements of intent offered by the legislature for any of the subsequent amendments, and thus Plaintiffs are unable to provide any direct evidence that the legislature intended the statutes to be punitive. (*Id.* ("For the other four bills at issue in this case, and generally for the registry law as amended since its original enactment, there is no coherent statement of purpose").)

Plaintiffs must instead rely on the "inference" of intent to press their case. (*Id.*) First, they argue that the amendments bear the hallmarks of a criminal scheme in that they are found in Chapter 14 of the state code which is otherwise reserved for criminal laws. (*Id.* at 28.) As the Court in *Smith* held, however, the placement of a statute within a state's criminal code does not "transform a civil remedy into a criminal one." 538 U.S. at 94. This argument is further unavailing given that the original registry law—which this Court has already held to be regulatory—is likewise in the same chapter, thus establishing that the chapter contains more than criminal statutes alone.

Plaintiffs next contend that, in contrast to the statute analyzed in *Smith*, "North Carolina's registry laws have no implementing regulations and are committed (except for some juvenile proceedings) exclusively to local sheriff[s] for enforcement and to the criminal justice system for prosecution." (*Id.* at 28.) However, in making its determination that the statute at issue in *Smith* was nonpunitive, the Supreme Court found it meaningful that its implementation

was entrusted to a state agency "charged with enforcement of both criminal *and* civil regulatory laws." 538 U.S. at 96 (emphasis in original). Such a scheme is likewise present here: in North Carolina, sheriffs not only enforce the criminal laws but maintain sex offender registries as well. *See* N.C. Gen. Stat. § 14-208.7.

Finally, Plaintiffs contend that the challenged amendments have additionally created "a separate set of felony offenses applicable only to registrants," including some which are "specifically labeled as 'offenses against public morality.'" (ECF No. 85 at 27–28 (referring to internet restrictions and a ban on name changes found in N.C. Gen. Stat. §§ 14-202.5 and 14-202.6, respectively).) However, the Court in *Smith* held that "[i]nvoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive." 538 U.S. at 96. Further, it found that the Alaskan statute was not punitive in nature even when "the scheme is enforced by criminal penalties." *Id.* This Court, therefore, concludes likewise and finds that such penalties are not necessarily indicative of a non-regulatory intent.

This Court has previously determined that the original stated purpose of the sex offender registry was regulatory in nature. (ECF No. 47 at 26.) Plaintiffs have provided no subsequent express statements of purpose as to the amendments nor have they provided evidence that materially differentiates the statutes at issue from the provisions found to be nonpunitive in *Smith*. The Court, viewing the evidence in the light most favorable to Defendants, therefore has no basis to find that the legislature intended the amendments to be punitive in nature as argued by Plaintiffs. Having thus concluded, the Court now moves to the next step in the *Smith* inquiry.

## B. Effects of the Statute

The Court next considers whether the statutory scheme is so punitive in effect that it "'negate[s] [the State's] intention' to deem it 'civil.'" *Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 346). Because a court must "ordinarily defer to the legislature's stated intent," *Hendricks*, 521 U.S. at 361, "only the 'clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson*, 522 U.S. at 100 (citation omitted).

In assessing whether the effects of a statute rise to this level, the Supreme Court has adopted the seven factors found in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), which "are designed to apply in various constitutional contexts" and are "neither exhaustive nor dispositive," *Smith*, 538 U.S. at 97 (citations and quotations omitted). The Court in *Mendoza-Martinez* identified those seven factors as:

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned . . . .

372 U.S. at 168–69 (citations omitted).

The parties here address a number of these factors, but their primary dispute centers around whether or not the amendments, as applied, impose an affirmative disability or restraint and whether their imposition closely mirrors historical punishment.[2] For instance,

---

[2] Defendants contend that this Court must not consider the effects of the legislation on the Plaintiffs themselves. (ECF No. 103 at 2–3 (arguing that Plaintiffs have lodged merely a "facial challenge" as opposed to an "as-applied challenge").) However, the Court in *Smith*, in applying the *Mendoza-Martinez* factors, found

12

Plaintiffs provide evidence suggesting that the legislation subjects registrants to regular surveillance and stands as a barrier to employment in several different sectors of the job market even beyond those named in the amendments expressly. (ECF No. 85 at 35–40.) Defendants counter that these allegations are exaggerated and not nearly as burdensome as Plaintiffs suggest. (ECF No. 88 at 31, 34 (calling the restraints Plaintiffs describe merely "inconvenient" and disagreeing about the extent to which police officers visit Plaintiffs' homes or whether their employment opportunities are as limited as alleged).)

This disagreement goes to the heart of the issues to be resolved in this case and is therefore significant enough to raise a genuine dispute of material fact between the parties, precluding summary judgment. The Court finds that neither party is entitled to judgment as a matter of law when their allegations are taken in the light most favorable to the non-movant. Accordingly, the Court denies both motions for summary judgment.[3]

## IV.    MOTIONS TO SEAL

The Court next considers Plaintiffs' motions to seal personally identifying information of parties and witnesses who are subject to registry requirements. "It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014) (citations omitted). "The right of public access springs from the First Amendment and the common-

---

that it must consider "how the effects of the [legislation] are felt by those subject to it." *Smith*, 538 U.S. at 99–100.

[3] Defendants have additionally submitted a motion to strike several statements that Plaintiffs have filed as a part of their motion for summary judgment. (*See* ECF No. 105.) The Court has reviewed these statements and determined that a resolution of this motion in either party's favor would not alter the outcome of the Court's denial of summary judgment. For that reason, the Court will hold the motion to strike in abeyance so that any outstanding issues may be resolved with respect to the statements' admissibility at trial.

13

law tradition that court proceedings are presumptively open to public scrutiny." *Id.* (citing *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004)). "The common law," however, "does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). "The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that 'countervailing interests heavily outweigh the public interests in access.'" *Doe*, 749 F.3d at 265–66 (quoting *Rushford*, 846 F.2d at 253). The First Amendment presumptive right of access, in contrast, extends "only to particular judicial records and documents." *Id.* at 266 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988). However, it may only be restricted upon a showing that such a restriction is "necessitated by a compelling government interest and . . . narrowly tailored to serve that interest." *Id.* (citation and internal quotation marks omitted).

"When presented with a request to seal judicial records or documents, a district court must comply with certain substantive and procedural requirements." *Va. Dep't of State Police*, 386 F.3d at 576 (citing *Rushford*, 846 F.2d at 253). Substantively, a district court must "first 'determine the source of the right of access with respect to each document.'" *Doe*, 749 F.3d at 266 (quoting *Va. Dep't of State Police*, 386 F.3d at 576). The Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion." *Id.* at 267 (citing *Rushford*, 846 F.2d at 252–53). Therefore, the First Amendment right of access applies in this case, as the documents which are the subject

14

of the motions to seal were filed with the Court in support of Plaintiffs' motions for summary judgment.

Procedurally, a district court presented with a sealing request must

(1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Id.* at 272 (citation omitted). Local Rule 5.4 outlines similar requirements.[4] L.R. 5.4. The burden rests on the party seeking to keep information sealed. *Va. Dep't of State Police*, 386 F.3d at 575.

Here, Plaintiffs move to seal the names and addresses of witnesses who have testified as to their experiences as persons subject to registry requirements. (ECF Nos. 96 at 1; 100 at 1–2.) As this Court held in granting a motion allowing Plaintiffs to proceed in this lawsuit under fictitious names, the nature of this case and the information these witnesses have shared are of a sensitive and highly personal nature. (ECF No. 22 at 3.) Further, while the Court will depend on this testimony to clarify the effects of the amendments at issue, the personally identifying information Plaintiffs seek to seal is, by comparison, of almost no importance aside from confirming that the witnesses are in fact required to register under the legislation at issue. Such information, however, may be easily established without publishing their names.

---

[4] These requirements are: (1) stating "the reasons why sealing is necessary;" (2) explaining "why less drastic alternatives to sealing will not afford adequate protection;" (3) "[a]ddress[ing] the factors governing sealing of documents reflected in governing case law;" and (4) stating "whether permanent sealing is sought and, if not, stat[ing] how long the document should remain under seal and how the document should be handled upon unsealing." L.R. 5.4(b).

The Court finds that these motions to seal were filed in August and September of 2020, thereby providing notice and a reasonable amount of time for the public to voice any objections. The Court additionally finds that Plaintiffs have redacted a very limited amount of information that would still provide access to all of the substantive testimony provided in the depositions or affidavits at issue. In their briefs, Plaintiffs also addressed case law applicable to their motion and stated that they were seeking a permanent seal. (ECF Nos. 97 at 2–4; 102 at 2–4.)

Noting that no party nor other entity has filed an objection to this very limited redaction, the Court finds that the sensitive nature of both the case and the testimony weighs in favor of sealing the personally identifying information permanently. Accordingly, the Court grants both motions.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion to Exclude the Expert Report of Drew Doll, (ECF No. 108), is GRANTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Plaintiffs, (ECF No. 83), is DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendants, (ECF No.84), is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motions to seal, (ECF Nos. 96; 100), are GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Portions of Plaintiffs' Supporting Documents, (ECF No. 105), shall be held in abeyance pending trial.

This, the 24th day of February 2021.

/s/ Loretta C. Biggs
United States District Judge